[Cite as *State v. Apanovitch*, 2016-Ohio-2831.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**Nos. 102618 and 102698**

## STATE OF OHIO

PLAINTIFF-APPELLANT

vs.

## ANTHONY APANOVITCH

DEFENDANT-APPELLEE

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-84-194156-ZA

**BEFORE:** Jones, A.J., Celebrezze, P.J., and Laster Mays, J.

**RELEASED AND JOURNALIZED:** May 5, 2016

**ATTORNEYS FOR APPELLANT**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY: Adam M. Chaloupka
       Katherine Mullin
       Christopher D. Schroeder
       Frank Romeo Zeleznikar
Assistant Prosecuting Attorneys
1200 Ontario Street, 8th Floor
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Mark R. Devan
William Livingston
Berkman, Gordon, Murray & Devan
55 Public Square, Suite 2200
Cleveland, Ohio 44113

Harry P. Cohen
Elizabeth Figueira
Michael K. Robles
James K. Stronski
Crowell & Morning
590 Madison Avenue
New York, NY 10022

LARRY A. JONES, SR., A.J.:

{¶1} This is an appeal by plaintiff-appellant, the state of Ohio, from the trial court's February 12, 2015 decision granting defendant-appellee's, Anthony Apanovitch, fourth petition for postconviction relief, thereby acquitting Apanovitch of one of two counts of rape, dismissing the second count of rape, and granting a new trial on the remaining charges, which consist of aggravated murder and aggravated burglary with specifications.[1] We affirm.

### Factual Background and Procedural History

{¶2} The incident that gave rise to this death penalty case was the 1984 rape and murder of Mary Ann Flynn; she was found dead in her Cleveland duplex on August 24, 1984. The investigation revealed that entry into the home had likely been through a basement window, which appeared to have been forcibly opened. Further, one of the basement window sills was missing. The day before her body was discovered, August 23, Apanovitch had been working at the house of Flynn's neighbor, and approached Flynn, whom he knew, to ask her if she wanted him to paint her basement window sills; she declined the offer.

{¶3} Flynn's body was discovered in a second-floor bedroom; she was naked and battered, lying face down on a mattress, with her hands tied behind her back, with one end

---

[1]The aggravated murder count contained a rape specification, but given the court's disposition on the two rape counts, that specification was dismissed.

of what appeared to be a rolled-up bed sheet tied around her neck and the other end tied to the headboard. Slivers of wood from a basement window sill were found in the bedroom, on Flynn's body, and in a laceration in the back of her neck.

{¶4} As mentioned, Apanovitch knew Flynn — he had done house painting for her in July 1984. During that time, he had made unwelcome advances toward her and even asked her out in the presence of his pregnant wife. Shortly after hiring Apanovitch in July 1984, Flynn terminated the use of Apanovitch's services prior to his completion of the painting. Afterward, however, she complained to friends that the "painter" still harassed her and that she was afraid of him. A copy of the contract for the painting work was found on Flynn's kitchen table the day after her body was discovered.

{¶5} Days after Flynn's body was discovered, Apanovitch became a suspect in her murder. He voluntarily made himself available for questioning by the police, waiving his *Miranda* rights. He denied any involvement in the crimes and voluntarily provided hair, saliva, and blood samples, along with several articles of clothing for testing. Apanovitch continued to deny involvement in the crimes throughout the investigation of the case.

{¶6} Apanovitch gave conflicting accounts of his whereabouts at the time it was surmised that the crimes occurred; however, according to three of the state's witnesses, he asked them to lie about his whereabouts. He also had scratches on his face and gave varying accounts to law enforcement about how he got them. The coroner, who had observed the scratches on Apanovitch's face while he was in police custody, testified at trial that she believed they were consistent with fingernail scratches.

{¶7} Little physical evidence of the assailant was found, however — no bodily material was found under Flynn's fingernails, the only blood at the scene belonged to Flynn, and no footprints were revealed. One hair was found on Flynn's body that was identified as being inconsistent with both Flynn and Apanovitch's hair, and although the police identified a number of latent fingerprints, none of them belonged to Apanovitch. At trial, only two pieces of scientific physical evidence were presented to the jury: the hair found on Flynn and evidence relating to the blood-type of Flynn and Apanovitch. As will be discussed in more detail below, both of these items of scientific physical evidence were problematic.

{¶8} On October 2, 1984, Apanovitch was indicted by a Cuyahoga County Grand Jury on two counts of rape, one count each of aggravated murder, with felony murder specifications, and aggravated burglary, with aggravated felony specifications. The case proceeded to a jury trial on November 26, 1984. The jury convicted Apanovitch of all counts and specifications and recommended a death sentence. The trial court adopted the jury's recommendation and imposed a death sentence. The court also sentenced Apanovitch to consecutive 15-25 year prison terms on the aggravated burglary and two rape convictions, for a total of 45-75 years in prison.

{¶9} This case has been the subject of extensive and convoluted litigation in both state and federal courts in the years since the 1984 conviction and 1985 death sentence.[2]

---

[2]Included in the numerous cases on this matter are the following: (1) *State v. Apanovitch*, 8th Dist. Cuyahoga No. 49772, 1986 Ohio App. LEXIS 8046 (Aug. 28, 1986) (direct appeal — conviction and sentence upheld); (2) *State v. Apanovitch*, 33 Ohio St.3d 19, 514 N.E.2d 394 (1987)

Those cases, and further facts, will be discussed below as necessary.

**1984 Autopsy**

**{¶10}** An autopsy of Flynn's body was conducted the day after her body was discovered. Sperm was found in Flynn's mouth and vagina. It was determined that the perpetrator of the crimes had blood type A. Apanovitch has blood type A, and that evidence was introduced by the state at trial. Apanovitch was also a secretor, meaning that he secretes his blood type through other bodily fluids. At trial, the analyst testified that approximately 44-55% of the population was blood type A and that approximately 80% of the population were secretors. According to the analyst, therefore, there were approximately 340,000 men in Cuyahoga County who could have emitted the fluids found in Flynn.

**Amended Trace Analyst Report**

**{¶11}** Flynn also had blood type A. The original trace evidence report that was available at the time of trial did not indicate if Flynn was a secretor, however. On appeal

---

(conviction and sentence upheld); (3) *State v. Apanovitch*, 70 Ohio App.3d 758, 591 N.E.2d 1374 (8th Dist.1991) (denial of first postconviction petition affirmed); (4) *State v. Apanovitch*, 107 Ohio App.3d 82, 667 N.E.2d 1041 (8th Dist.1995) (denial of second postconviction petition affirmed); (5) *State v. Apanovitch*, 113 Ohio App.3d 591, 681 N.E.2d 961 (8th Dist.1996) (denial of third postconviction petition affirmed); (6) *Apanovich* [sic] *v. Taft*, S.D.Ohio No. 2:05-CV-1015, 2006 U.S. Dist. LEXIS 54607 (July 21, 2006) (dismissal of Apanovitch's civil rights action as an Ohio death-row inmate affirmed); (7) *Apanovitch v. Houk*, 466 F.3d 460 (6th Cir.2006) (appeal of denial of Apanovitch's writ of habeas corpus — judgment reversed in part; case remanded to district court for consideration of certain *Brady* issues and for a hearing on the state's request that Apanovitch's DNA be compared to swabs previously believed lost); (8) *Apanovitch v. Houk*, N.D.Ohio No. 1:91CV2221, 2009 U.S. Dist. LEXIS 103985 (Aug. 14, 2009) (proceeding on remand — habeas writ denied); and (9) *Apanovitch v. Bobby*, 648 F.3d 434 (6th Cir.2011) (denial of writ of habeas affirmed).

to the Ohio Supreme Court, after Apanovitch's direct appeal to this court, which affirmed the convictions and sentence,[3] the Ohio Supreme Court upheld the convictions and sentence in a 4-3 decision. *Apanovitch*, 33 Ohio St.3d 19, 514 N.E.2d 394 (1987). The dissent objected to the imposition of the death penalty, finding that the "evidence of guilt in this case, while sufficient to meet the various standards which an appellate court must use to measure legal error, is far from overwhelming." *Id.* at 29 (Brown, J., concurring and dissenting).

{¶12} The dissent had two evidentiary areas of concern. The first, raised sua sponte by the dissent, related to the blood evidence:

> If the victim was a secretor, the recovery of a type A antigen from the swab contained from the victim (who herself was a type A) offers no information concerning the blood type of the assailant, because *the recovered antigens could have as easily originated from the victim as from the assailant*.

(Emphasis sic.) *Id.* at 30.

{¶13} Flynn, in fact, was a secretor. The police knew this within the first few days of their investigation, but it was not disclosed to Apanovitch until 1992. After the Ohio Supreme Court's decision, the trace evidence report was amended to reflect Flynn's secretor status.

{¶14} The dissent's second concern related to the human hair found on Flynn, which, as mentioned, was neither Flynn nor Apanovitch's hair. The state's position at trial was that it was not uncommon for law enforcement or crime scene personnel to lose a

---

[3] *State v. Apanovitch*, 8th Dist. Cuyahoga No. 49772, 1986 Ohio App. LEXIS 8046 (Aug. 28, 1986).

hair while doing their work around a body.   The dissent stated:

> [w]hile this may have been the case, the better approach would have been to have the hair analyzed against all crime scene personnel who could have deposited it.   Such elimination procedure is not overly burdensome given the penalty sought to be extracted by the state.

*Id.* at 31.

{¶15} At trial, the state's representative testified that the hair was found "on the back portion of [Flynn's] hand, which would have been the upper surface."   *Apanovitch*, 648 F.3d 439 (6th Cir.2011).   The representative also described the hair as being "in the area of [Flynn's] hand."   *Id.* at 440.   The state argued that the hair could have fallen from the law enforcement officials who were around Flynn's body after it was discovered and transported to the coroner's office.   But the state did not disclose to the defense that the report prepared by the trace evidence department stated that the hair was found "under [Flynn's] bound hands."   *Id.* at 439.

{¶16} The course of the litigation in this case also demonstrated that the state failed to disclose to the defense a document in which a detective wrote that Apanovitch said something different than what the detective testified at trial was said.   Specifically, the detective testified at trial that in a pre-arrest conversation with Apanovitch, Apanovitch asked him to let him know "when" he was going to be arrested so that he could break the news to his mother, who had a heart condition.   *Id.* at 438.   The detective testified that Apanovitch's request "stunned" him.   *Id.*   The detective's report, however, stated that Apanovitch asked the detective to give him warning "if" he was going to be arrested.   *Id.*   The report further states that, even with his request, Apanovitch maintained his

innocence, which the jury was also not informed of. Apanovitch did not secure the Cleveland Police Department's investigative file until years after his conviction, during his state postconviction proceedings.

**Autopsy Swabs**

{¶17} Swabs of bodily fluids from Flynn's body were collected during the autopsy. At the time of trial, however, they were unavailable — the state believed they had been inadvertently lost or destroyed. In 1991, the state found the evidence — two oral slides and one vaginal slide — in a desk of an employee at the coroner's office.

**Testing after the Previously Believed Lost Evidence was Discovered**

{¶18} After the slides were discovered, the prosecutor's office sent the three slides to the Forensic Science Laboratory ("FSA") in California for testing. In May 1992, FSA issued a report finding that one slide of the oral swab could be tested, but that the second oral swab and the vaginal slide could not be tested because of the size and deterioration of the samples. More testing was also conducted by the coroner's office in 2000 and 2001, but Apanovitch was not made aware of the testing or results until 2008 during his federal habeas proceeding.

{¶19} During his federal habeas proceeding, the district court deferred any consideration of the DNA evidence until chain of custody issues were resolved. After the chain of custody issues were resolved in favor of the state, the district court declined to hold a hearing on the DNA issues and instead issued a final decision. On appeal to the

Sixth Circuit, the court noted that the DNA evidence had not been "subjected to appropriate evidentiary challenges," stating the following:

> We suspect that the DNA evidence, should it be introduced and subjected to appropriate evidentiary challenges in court, might help resolve lingering questions of whether Apanovitch suffered actual prejudice when the state withheld the serological evidence, and whether Apanovitch's innocence claim can be verified. We note that Apanovitch could well benefit from any ambiguity or error in the results that might lessen the exact accuracy of any hypothetical match with his own DNA. But these issues are better suited to the district court.

*Apanovitch*, 466 F.3d at 489-490 (6th Cir.2006).

{¶20} The district court never held a hearing on the DNA evidence, however, DNA testing that was not available at the time of trial was conducted on the evidence and Dr. Edward Blake, of FSA, issued a 2007 report.

{¶21} In 2012, after all of his federal appeals were exhausted,[4] Apanovitch filed his fourth petition for postconviction relief in the common pleas court based on the newly discovered evidence. The petition was brought under R.C. 2953.21(A)(1), and the parties also agreed that Crim.R. 33, governing new trials, applied. On October 14 and 15, 2014, the trial court held a hearing on the petition, and thereafter issued the February 12, 2015 judgment, which is the subject of this appeal.

**Dr. Edward Blake of FSA**

{¶22} Prior to the hearing on the petition at issue, the parties had much discussion about Dr. Blake at numerous pretrial conferences with the court. The discussion centered

---

[4]In 2012, the United States Supreme Court denied Apanovitch's petition for writ of certiorari. *Apanovitch v. Bobby*, 132 S.Ct. 1742, 182 L.Ed.2d 535 (2012).

around Dr. Blake's lack of willingness to participate in this case. Apanovitch had attempted to depose him, but he refused to appear unless he was paid substantial hourly fees and costs. Discussion regarding various options about how to proceed vis-a-vis Dr. Blake was had during the course of the pretrial conferences.

{¶23} At one of the conferences regarding Dr. Blake, held on July 31, 2014, the state represented that, given the problems with securing Dr. Blake, it would not be relying on him as a witness at the hearing on Apanovitch's fourth postconviction petition. The trial court then stated its "position that Blake's out and I'm not going to allow him to testify." The defense confirmed for "clarification, so we're all on the same page, it's not just that he won't be allowed to testify, it's that his prior reports and his prior work will not be allowed in and will not be used and relied on for any purpose." The trial court stated that was the understanding, and the state did not object. In an order dated August 1, 2014, the court confirmed that "Dr. Blake will not be presented as a witness and none of his reports or findings will be admitted."

{¶24} Prior to the hearing at issue here, the parties agreed on a joint set of hearing exhibits, which included the trial transcript and many of the original trial exhibits. Two experts testified at the October 2014 hearings — Dr. Rick Staub for the defense and Dr. Elizabeth Benzinger for the state. Both experts testified in depth about DNA testing, the reliability of samples, and interpreting the results.

**Dr. Staub**

{¶25} Dr. Staub, a forensic scientist, testified for the defense.[5]   He reviewed the DNA testing on the samples taken from Flynn during her autopsy.   He testified about the one item (item 1.2) that provided informative data for both the female portion of the data and the male portion of the data; the slide was made from material taken from Flynn's vagina that contained sperm.   According to Dr. Staub, the female portion was consistent with Flynn's profile.   The male portion of the DNA had a mixture of at least two contributors, and Apanovitch was excluded as a contributor to that sample, meaning he could not have contributed to that DNA.

{¶26} Dr. Staub further testified about how he would account for the possibility of the slide being contaminated and found in regard to item 1.2 that there was no possibility of contamination "whatsoever."   Thus, Dr. Staub's conclusion as to item 1.2 was that Apanovitch "could not have contributed the DNA that's found in that sample."

**Dr. Benzinger**

{¶27} Dr. Benzinger, from the Ohio Bureau of Criminal Investigations, testified for the state.   She testified that she believed that there are at least three people's DNA in the item 1.2 sample.   Dr. Benzinger testified that she believed the sample was contaminated, although she admitted that the two people who had previously worked on it during the time frame she believed the contamination occurred were females.   Dr. Benzinger was not asked if it was her opinion whether the results of the testing on item 1.2 excluded

_____

[5]Dr. Staub owned a consulting business and manages the crime scene investigation unit and evidence room for the Plano, Texas police department.   Most of his previous expert testimony had been for the prosecution.

Apanovitch.

{¶28} Based on this testimony, the trial court found that Dr. Staub's testimony was uncontroverted and, therefore, that Apanovitch presented clear and convincing evidence of his actual innocence of vaginal rape, and acquitted him of same.

{¶29} The two counts of rape were identically worded. The court further found that, because the two rape counts were identical and there was no other differentiation between them (i.e., vaginal and oral rape), the lack of specificity required dismissal of the other rape count. The court then found that, with the two counts of rape removed, the "nature and tenor of the case changes greatly." Thus, under Crim.R. 33, the court found that subsection 4 — that the verdict is not sustained by sufficient evidence or is contrary to law — applied and ordered a new trial as to the aggravated murder with specifications and aggravated burglary with specifications. The state appeals, raising the following five assignments of error for our review:

> I. The trial court abused its discretion by finding that Apanovitch proved by clear and convincing evidence his actual innocence of the vaginal rape.
>
> II. The trial court abused its discretion by refusing to consider the FSA reports confirming Apanovitch's sperm was present in Flynn's mouth.
>
> III. The trial court erred by ambushing the State with a new and unbriefed issue in its opinion that it never gave the parties an opportunity to address.
>
> IV. The trial court erred by finding a *Valentine* error where there were only two counts of rape in the indictment and the evidence at trial delineated a separate factual basis for each count.
>
> V. The trial court abused its discretion by setting a bond of just $100,000 in a death penalty case.

## Law and Analysis

**Standard of Review**

{¶30} A trial court's decision regarding a postconviction petition filed pursuant to R.C. 2953.21 will be upheld absent an abuse of discretion when the trial court's finding is supported by competent and credible evidence. *State v. Condor*, 112 Ohio St.3d 377, 390, 2006-Ohio-6679, 860 N.E.2d 77. "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). Thus, we should not overrule the trial court's finding on Apanovitch's petition if the court's decision is supported by competent and credible evidence.

**Trial Court's Finding of Actual Innocence as to Vaginal Rape without Considering Dr. Blake's Reports**

{¶31} The state's first assignment of error challenges the trial court's finding of actual innocence as to the vaginal rape. The state's second assignment of error challenges the trial court's decision in that it did not consider Dr. Blake's reports.

{¶32} R.C. 2953.23 governs successive petitions for postconviction relief and, relative to this case, provides that a court may consider such a petition if

> [t]he petitioner was convicted of a felony, the petitioner is an offender for whom DNA testing was performed under sections 2953.71 to 2953.81 of the Revised Code or under former section 2953.82 of the Revised Code and analyzed in the context of and upon consideration of all available admissible evidence related to the inmate's case as described in division (D) of section 2953.74 of the Revised Code, and the results of the DNA testing establish, by clear and convincing evidence, actual innocence of that felony offense or, if the person was sentenced to death, establish, by clear and convincing

evidence, actual innocence of the aggravating circumstance or circumstances the person was found guilty of committing and that is or are the basis of that sentence of death.

R.C. 2953.23(A)(2).

{¶33} Under R.C. 2953.21(A)(1)(b), actual innocence means that

had the results of the DNA testing conducted under sections 2953.71 to 2953.81 of the Revised Code or under former section 2953.82 of the Revised Code been presented at trial, and had those results been analyzed in the context of and upon consideration of all available admissible evidence related to the person's case as described in division (D) of section 2953.74 of the Revised Code, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted, or, if the person was sentenced to death, no reasonable factfinder would have found the petitioner guilty of the aggravating circumstance or circumstances the petitioner was found guilty of committing and that is or are the basis of that sentence of death.

{¶34} "Clear and convincing evidence requires a degree of proof that produces a firm belief or conviction regarding the allegations sought to be proven." *State v. Gunner*, 9th Dist. Medina No. 05CA0111-M, 2006-Ohio-5808, ¶ 8. "It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases." *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

{¶35} In its first assignment of error, the state maintains that, in addition to the "voluminous circumstantial evidence" against Apanovitch, Dr. Blake's 2007 testing demonstrated that Apanovitch was not actually innocent of the vaginal rape. The state contends that the "trial court, however, disregarded [Dr. Blake's findings] in favor of other testing of a weaker DNA sample that yielded multiple male profiles and that had no

definitive nexus to the murder."

{¶36} Thus, the state is now contending in this appeal that the trial court abused its discretion by failing to consider Dr. Blake's findings. As previously set forth, Dr. Blake was the subject of much discussion in the proceedings on this fourth postconviction petition. In sum, the defense sought to depose him, he was uncooperative because he wanted to be paid substantial hourly fees and costs, and ultimately the state stipulated that because of the problems in securing his appearance, the state would not be relying on him as a witness in these proceedings. To that end, the trial court issued an order stating "Dr. Blake will not be presented as a witness and none of his prior reports of findings will be admitted."

{¶37} The state contends that, its stipulation aside, Dr. Blake's findings were part of the record in this proceeding because it was "litigated to finality by the federal district court," whose "decisions were binding on the state courts." The state also maintains that Dr. Blake's findings were part of the record because Apanovitch attached them to his postconviction petition at issue now.

{¶38} The trial court, citing this court's decision in *State v. Larkin*, 8th Dist. Cuyahoga No. 85877, 2006-Ohio-90, declined to follow the law of the case as it related to the DNA evidence. Rather, the trial court considered the DNA evidence "free from any restraint which could have been imposed by that doctrine." We find that the trial court acted within its discretion in that regard.

{¶39} In *Larkin*, this court stated that following in regard to the law of the case

doctrine:

> The United States Supreme Court has stated that "law of the case is an amorphous concept. As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California* (1983), 460 U.S. 605, 618, 103 S. Ct. 1382, 75 L. Ed. 2d 318, citing 1B J. Moore & T. Currier (1982), Moore's Federal Practice, [pg].404. The Ohio Supreme Court has interpreted the law of the case doctrine to provide that the "decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels." *Nolan v. Nolan* (1984), 11 Ohio St.3d 1, 3, 11 Ohio B. 1, 462 N.E.2d 410.

*Id.* at ¶ 29.

**{¶40}** This court explained that there are exceptions to the law of the case doctrine, however, stating:

> The law of the case doctrine is discretionary in application, subject to three exceptions: (1) the evidence at a subsequent trial is substantially different; (2) there has been an intervening change of law by a controlling authority; and (3) the earlier decision is clearly erroneous and would work a manifest injustice.

*Id.* at ¶ 30, citing *United States v. Bezerra*, 155 F.3d 740, 752-753 (5th Cir. 1998).

**{¶41}** In this case, the trial court found that the first and third exceptions applied. Specifically, the court found that "[a]s a result of the evidence presented at [the] hearing there has been a material change in the nature of the evidence from what was presented at trial," and the "new evidence shows that, at least, some portion of the prior decision was clearly erroneous and to apply the law of the case would work a manifest injustice."

**{¶42}** As mentioned, the law of the case doctrine is discretionary; it is considered a "rule of practice rather than a binding rule of substantive law and will not be applied so as

to achieve unjust results." *Hubbard ex rel. Creed v. Sauline*, 74 Ohio St.3d 402, 404, 659 N.E.2d 781 (1996). On the record before us, we find that the trial court acted within its discretion in not applying the law of the case doctrine as it related to the DNA evidence.

{¶43} In regard to the state's contention that Dr. Blake's findings should have been considered by the trial court because Apanovitch attached them to his fourth petition, we reiterate the extensive discussion that was had by the parties regarding Dr. Blake and the state's ultimate stipulation that it was not going to rely on any of Dr. Blake's findings. After such a stipulation, it would be unjust to now allow the state to reverse course.

{¶44} Thus, the trial court was left with the opinion of Dr. Staub, who unequivocally opined that the results of the DNA testing of the vaginal slide materials excluded Apanovitch. Dr. Benzinger did not controvert that finding.

{¶45} Moreover, contrary to the state's position, there was not "voluminous circumstantial evidence" against Apanovitch. As the dissent in Apanovitch's appeal to the Ohio Supreme Court noted, the "evidence of guilt in this case * * * is far from overwhelming." *Apanovitch*, 33 Ohio St.3d at 29, 514 N.E.2d 394 (Brown, J., concurring and dissenting).

{¶46} On this record, therefore, the trial court did not abuse its discretion in finding that Apanovitch presented clear and convincing evidence of actual innocence relative to vaginal rape.

{¶47} In light of the above, the state's first and second assignments of error are overruled.

*Valentine* **Issue**

**{¶48}** In its third assignment of error, the state challenges the trial court's dismissal of the second count of rape under *Valentine v. Konteh*, 395 F.3d 626 (6th Cir.2005). In its fourth assignment of error, the state contends that the trial court erred in finding a *Valentine* violation because the trial evidence delineated a separate factual basis for each of the two counts of rape.

**{¶49}** Counts 3 and 4 of the indictment against Apanovitch identically charged rape. After the trial court found that Apanovitch had presented clear and convincing evidence of actual innocence relative to the vaginal rape, the trial court was left with the query of which count should be dismissed. No bill of particulars was filed in this case, so there was no clarification in that regard. The trial court then considered the jury instructions for guidance. The instructions referred to "vaginal intercourse and/or fellatio," but did not distinguish which allegation of rape went with which count. Thus, the jury instructions did not provide any guidance. Because the court could not differentiate either of the rape counts, it acquitted Apanovitch of one count as relief under his postconviction petition, and dismissed the other for its "lack of specificity or differentiation from the other count in violation of [Apanovitch's] due process rights." The court cited *Valentine* in support of its decision.

**{¶50}** The state contends that the trial court erred by raising the issue sua sponte, without giving the parties the opportunity to brief it, and cites *State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, 19 N.E.3d 888, in support of its contention. In *Tate*, the defendant

appealed his gross sexual imposition and kidnapping convictions on sufficiency grounds. Specifically, he contended that the state had failed to produce evidence that he forced, threatened, or deceived the victim to go with him or that he used force or threat of force to obtain sexual contact. He never contended that he was not the perpetrator and, in fact, testified at trial that he had approached the victim, walked with her, and asked for oral sex. According to the defendant, he had not initially approached the victim with sexual motives and ended the encounter when he learned that she was underage.

{¶51} This court, sua sponte, raised the issue of identity, finding that the "record before the court is devoid of any testimony from the victim or either of her two friends identifying the appellant as the perpetrator," and that there was "not sufficient evidence, circumstantial or otherwise, that the appellant was 'the man' repeatedly referenced in the testimony of the victim and her two friends." *State v. Tate*, 8th Dist. Cuyahoga No. 97804, 2013-Ohio-570, ¶ 10, 13.

{¶52} On appeal to the Ohio Supreme Court, the court held that there was "no conflicting evidence on the issue of identity — Tate agreed that he was the man with [the victim]." *Tate*, 140 Ohio St.3d at 446, 2014-Ohio-3667, 19 N.E.3d 888. The court reversed, "not only because the evidence of Tate's identity was overwhelming, but also because neither party argued otherwise." *Id.* The court stated that "appellate courts should not decide cases on the basis of a new, unbriefed issue without 'giv[ing] the parties notice of its intention and an opportunity to brief the issue." *Id.*, citing *State v. 1981 Dodge Ram Van*, 36 Ohio St.3d 168, 170, 522 N.E.2d 524 (1988).

**{¶53}** In light of the above, *Tate* presents a scenario distinguishable from the one presented here. We do recognize that, in some instances, a court's raising of an issue sua sponte without allowing the parties to brief the issue can be a violation of the parties' due process rights. But we also recognize that

> 'trial courts are on the front lines of administration of justice in our judicial system, dealing with the realities and practicalities of managing a caseload and responding to the rights and interests of the prosecution, the accused, and victims. A court has the 'inherent power to regulate the practice before it and protect the integrity of its proceedings.'

*State v. Busch*, 76 Ohio St.3d 613, 615, 669 N.E.2d 1125 (1996), quoting *Royal Indemn. Co. v. J.C. Penney Co.*, 27 Ohio St.3d 31, 33-34, 501 N.E.2d 617 (1986). Thus, in *Busch*, the Ohio Supreme Court upheld the trial court's sua sponte dismissal of an indictment in the interest of justice. Further, the Ohio Supreme Court has sua sponte addressed the issue of whether a defendant's double jeopardy rights would be violated by requiring a second trial after a dismissal of a defective indictment. *State v. Broughton*, 62 Ohio St.3d 253, 263, 581 N.E.2d 541 (1991).

**{¶54}** We are also not persuaded by the state's contention that Apanovitch had to raise this issue during the trial proceedings. In *State v. Wilson*, 8th Dist. Cuyahoga No. 93772, 2010-Ohio-6015, this court recognized that the "only way a double jeopardy issue will arise is if appellant's conviction on count three is reversed and the state wishes to retry him." *Id.* at ¶ 17.

**{¶55}** In light of the above, we find that the trial court properly considered the double jeopardy issue and we now consider the merits of the court's decision.

**{¶56}** In *Valentine*, 395 F.3d 626 (6th Cir.2005), the Sixth Circuit Court of Appeals affirmed the district court's decision granting habeas corpus relief to the defendant on all but one of his rape convictions, holding that the multiple, undifferentiated charges of rape violated the defendant's constitutional rights. *Id.* at 634. The state contends, citing this court, that

> *Valentine* has no binding effect on Ohio courts. It has been criticized for applying law that does not apply to Ohio grand juries, misapplying and misrepresenting case authority, and being "distinguished in every subsequent Sixth Circuit decision that cites it on this issue."

*State v. Schwarzman*, 8th Dist. Cuyahoga No. 100337, 2014-Ohio-2393, ¶ 11, quoting *State v. Billman*, 7th Dist. Monroe Nos. 12 MO 3 and 12 MO 5, 2013-Ohio-5774.

**{¶57}** We recognize that *Valentine* was not binding on the trial court, but find that its discussion is helpful to the issue at hand. Specifically, in *Valentine*, the Sixth Circuit discussed two sections of the Fifth Amendment. First, the court discussed the due process portion of the Fifth Amendment which, under *Russell v. United States*, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962), requires that a criminal defendant be given adequate notice of the charges in order to enable him or her to mount a defense.

**{¶58}** Second, the court discussed the double jeopardy portion of the Fifth Amendment, which requires enough specificity of facts in an indictment to prevent a re-indictment or retrial on charges that have already been decided by a trier of fact. The Sixth Circuit held that an indictment was constitutionally sufficient only if it "(1) contains the elements of the charged offense, (2) gives the defendant adequate notice of the charges, and (3) protects the defendant against double jeopardy." *Valentine* at 631.

"The vast majority of cases from our district that have applied *Valentine* have been resolved under a double jeopardy analysis." *State v. Freeman*, 8th Dist. Cuyahoga No. 92809, 2010-Ohio-3714, ¶ 35.

{¶59} For example, in *State v. Ogle*, 8th Dist. Cuyahoga No. 87695, 2007-Ohio-5066, the defendant was charged, in part, with three identically worded counts of rape, which the state contended consisted of two instances of digital rape and one instance of oral rape. After deliberating, the jury informed the trial court that it was deadlocked on one of the three counts of rape. The court accepted the jury's verdict, which included not guilty on two of the rape counts; the court declared a mistrial on the third count of rape. The defendant filed a motion to dismiss the third rape count, and the trial court denied his motion.

{¶60} On appeal, this court reversed, finding that subjecting the defendant to a retrial on the third rape count would violate his double jeopardy rights. This court reasoned that it is

> well established that the Double Jeopardy Clause protects against successive prosecutions for the same offense. * * * Once a tribunal has decided an issue of ultimate fact in the defendant's favor, the double jeopardy doctrine also precludes a second jury from ever considering that same or identical issue in a later trial.

(Citations omitted.) *Id.* at ¶ 17, 19.

{¶61} Likewise, here, at issue is whether the indictment against Apanovitch contains enough specificity as to the two rape counts that a retrial on the remaining rape count will not violate his double jeopardy protections. It does not. We have carefully

reviewed the record, as did the trial court, and find that there is nothing differentiating which count of rape was for which conduct — the indictment itself did not differentiate, there was no bill of particulars, the jury instructions did not differentiate, and neither the state's opening or closing statements made the distinction.

{¶62} In light of the above, and on this record, we overrule the state's third and fourth assignments of error.

**Bond**

{¶63} For its final assignment of error, the state contends that the trial court abused its discretion by setting a $100,000 bond in this case.[6]   According to the state, the court failed to consider the bond schedule of the Cuyahoga County Court of Common Pleas and the Ohio Constitution.

{¶64} After reading its decision on this postconviction petition, the trial court addressed the issue of bond and set a $100,000 personal bond with house arrest and electronic monitoring.   The state filed a motion for reconsideration, which the trial court granted.   In granting the state's motion, the trial court stated that it had "acted prematurely and did not show a wise decision," and amended the bail to $100,000 cash, surety or property, with house arrest, electronic monitoring, and court-supervised release. The state maintains that the bond is "inadequate to protect the safety of the public" from Apanovitch, and that the trial court "disregarded the facts of this case and chose to

---

[6]A trial court's bond determination is within its discretion.   *In re De Fronzo*, 49 Ohio St.2d 271, 274, 361 N.E.2d 448 (1977).

presume that the indictment was false."

{¶65} We disagree with the state's contention that the trial court disregarded the facts of the case and acted as if the indictment was false. The trial court set Apanovitch's bond after it had conducted a two-day evidentiary hearing, had reviewed volumes of evidence, not only from the two-day hearing, but also from past proceedings, and had reviewed the numerous prior cases relating to this matter. The trial court acknowledged that it had initially "acted prematurely" and did not make a "wise decision" in setting the bond. Therefore, the court reconsidered its initial bond determination, specifically stating this is "still a capital case and while I did * * * make some decisions with regard to two counts in this case, it still leaves two very major and valid counts."

{¶66} We also note, as cited by Apanovitch, a similar case in this district in which a "low bond" was set after postconviction proceedings. Namely, in *State v. Keenan*, Cuyahoga C.P. No. CR-88-232189, the defendants were convicted of murder, sentenced to death, and granted postconviction relief after years of litigation. The trial court ordered their release on a $5,000 personal bond for one defendant and a $50,000 surety bond with house arrest and electronic monitoring for the other defendant.

{¶67} On the record before us, we do not find that the trial court abused its discretion in setting Apanovitch's bond. The fifth assignment of error is therefore overruled.

## Conclusion

{¶68} The trial court's February 12, 2015 judgment is affirmed. The issue for

determination in Apanovitch's fourth postconviction petition was whether newly discovered DNA evidence demonstrated his actual innocence. The state stipulated that Dr. Blake and his reports would not be part of the proceedings. The defense presented the expert testimony of Dr. Staub, who testified that it was his opinion that the results of the DNA testing of the vaginal slide materials excluded Apanovitch. The state did not elicit testimony from its expert, Dr. Benzinger, that contradicted that Dr. Staub's finding on that point. The trial court therefore did not abuse its discretion in finding that the evidence presented by Apanovitch met the standard of clear and convincing evidence of actual innocence as it related to the vaginal rape.

**{¶69}** Further, because the two counts of rape were identically worded in the indictment, and there was no differentiation of them elsewhere in the record, it was impossible for the court to discern which count of rape it should acquit on. To retry Apanovitch on the remaining count would violate his double jeopardy rights. Thus, the trial court properly acquitted on one count and dismissed on the other count.

**{¶70}** Finally, there was no abuse of discretion in the trial court's bond determination. The court properly considered the facts of the case and the nature of the remaining charges.

**{¶71}** Judgment affirmed; case remanded to the trial court for further proceedings consistent with this opinion.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LARRY A. JONES, SR., ADMINISTRATIVE JUDGE

FRANK D. CELEBREZZE, JR., P.J., and
ANITA LASTER MAYS, J., CONCUR